IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LOMMIA FAYE STREET,            )
                               )
          Plaintiff,           )
                               )
     v.                        )          1:21-cv-941
                               )
JOHN SANTIAGO,                 )
TRAVIS J. NELLIS, and          )
UNITED STATES OF AMERICA,      )
                               )
          Defendants.          )

MEMORANDUM OPINION AND ORDER

OSTEEN, JR., District Judge

Before this court is Defendants' Motion for Summary
Judgment, (Doc. 40). This matter is ripe for adjudication and,
for the reasons set forth herein, Defendants' motion will be
granted in part and denied in part.

I.    FACTUAL BACKGROUND

Plaintiff's claims for relief arise out of a series of
events that occurred at a Veterans Affairs clinic ("VA clinic")
in Kernersville, North Carolina on June 12, 2019. (Aff. of
Lommia Faye Street ("Pl.'s Aff.") (Doc. 47) ¶¶ 2-3.)

On this date, Plaintiff visited the VA clinic to attend an
appointment with her physician. (Id. ¶ 3.) Upon arrival,
Plaintiff sought to use a check-in kiosk in the clinic's lobby
to register for her upcoming appointment. (Id. ¶ 5.) As

Plaintiff waited to use a kiosk, a man — later identified as Lt. Colonel Cummings — "cut in front of [Plaintiff] and began to use a kiosk that had been vacated." (Id.) Plaintiff stepped forward, engaged in conversation with Cummings, and then ejected his VA identification card from the kiosk. (Id.) Cummings retrieved his card from Plaintiff and walked away. (Id.)[1]

After Cummings walked away, Plaintiff sought to use the kiosk herself and elicited assistance from a VA volunteer, Karin Dalkey. (Id. ¶ 6.) While receiving assistance, Plaintiff discussed with Ms. Dalkey her incident with Cummings, but told Ms. Dalkey that "it was over," and "to forget it." (Id. ¶ 9.)

It is unclear who relayed news of the incident to the police dispatch, but shortly thereafter, John Santiago – a police officer stationed at the VA clinic – received "a report from dispatch that a female veteran had reported being assaulted by another veteran in the lobby." (Defs.' Ex. 2, Aff. of John

---

[1] Plaintiff and Defendants offer differing facts and conclusions about Plaintiff's interaction with Cummings at the kiosk. This court is bound to consider the parties' properly supported factual allegations but declines to adopt unsupported conclusions. For example, Plaintiff, in her affidavit, contends that "[t]he video shows that I calmly engaged in a conversation with Cummings." (Pl.'s Aff. (Doc. 47) ¶ 5.) Although the video may show that Plaintiff did not punch or hit Cummings, the video has no sound and therefore does not show whether Plaintiff "calmly engaged" with Cummings. To the contrary, the facts show that Plaintiff, without permission, removed Cummings' card from the kiosk, an act which does not suggest that Plaintiff "calmly engaged" with Cummings.

Santiago ("Santiago's Aff.") (Doc. 41-1) at ¶¶ 2-3.) Santiago traveled to the lobby and spoke briefly with Ms. Dalkey, where she advised him that "a female veteran wanted to report an assault on her by another veteran." (Id. ¶ 4). Santiago then located Plaintiff in the lobby and initiated a conversation with her. (Id. ¶ 5). These facts are not disputed.[2]

Santiago attests that during his initial conversation with Plaintiff in the lobby, she informed him that "a veteran" had "aggressively grabbed" her wrist and threatened her. (Id.) Plaintiff attests, meanwhile, that she told Santiago "to forget about" the incident. (Pl.'s Aff. (Doc. 47) ¶ 9.) Notably, Plaintiff does not dispute that she told Santiago a veteran had "aggressively grabbed her wrist." (See Santiago's Aff. (Doc. 41-1) ¶ 5.)

_____

[2] Plaintiff asserts that she "did not tell Ms. Dalkey that [she] wanted to report an assault." (Pl.'s Aff. (Doc. 47) ¶ 9.) However, Ms. Dalkey, and other witnesses in the lobby, were still free to report to dispatch what they perceived to be a disturbance in the lobby. Plaintiff does not offer any evidence to dispute what Santiago attests Dalkey told him about Plaintiff wanting to report an assault after he was summoned to the lobby.

After this initial conversation in the lobby,[3] Santiago departed to review security footage of the altercation, (id. ¶ 6), as well as to interview Mr. Cummings, (id. ¶ 9), the veteran who purportedly "aggressively grabbed" Plaintiff's wrist, (id. ¶ 5). During this interview, Cummings informed Santiago that Plaintiff had "yell[ed] at him while he was at a check-in kiosk, and then took his veteran identification card out of the kiosk

---

[3] The parties appear to disagree about whether this initial lobby conversation between Santiago and Plaintiff took place over one or two parts.

Plaintiff's affidavit acknowledges only one initial conversation in the lobby. (Compare Pl.'s Aff. (Doc. 47) ¶ 9 (referencing "the first conversation" with Santiago in the lobby), with id. ¶ 11 (describing Plaintiff's later confrontation with Santiago by the clinic's entrance); see also Pl.'s Resp. (Doc. 46) at 6 ("There was a delay of more than an hour and a half between the time Santiago first spoke with Street and the time he confronted her [by the entrance to the clinic].")).

Santiago contends that he initially conversed with Plaintiff in the lobby, departed momentarily to review security footage, and then returned to the lobby shortly thereafter for a second conversation in which he informed Plaintiff that he "did not see an assault on the video" but that he would "continu[e] to review videos from other cameras" and "also speak with Mr. Cummings." (Santiago's Aff. (Doc. 41-1) ¶¶ 5-8.) After this second initial conversation in the lobby, Santiago contends he departed to interview Cummings and later located Plaintiff by the clinic's entrance. (Id. at ¶¶ 9-10.) This later encounter by the clinic's entrance escalated into a physical confrontation and is the basis of Plaintiff's claims.

The parties' apparent dispute about whether the initial lobby conversation occurred in one or two parts is immaterial. This memorandum opinion will refer to the "initial encounter in the lobby" (without making the finding of whether it occurred in one or two parts) and the "later encounter by the clinic's entrance."

- 4 -

he was using." (Id. ¶ 9) Additionally, Cummings stated that he "took his identification card back" from Plaintiff and told her he would "report her to the police" if she took it again. (Id.) These facts about Santiago's interview with Cummings are undisputed.

After Santiago interviewed Cummings and reviewed the security footage,[4] he sought out Plaintiff "to speak with [her]," and located her near the entrance of the clinic. (Id. ¶ 10; Pl.'s Aff. (Doc. 47) ¶ 11.) After roughly two minutes of conversation, (Pl.'s Aff. (Doc. 47) ¶ 11), Plaintiff attempted to leave, but Santiago positioned his body in front of Plaintiff to block her exit, (id. ¶¶ 12-13). A physical confrontation ensued and resulted in Plaintiff being handcuffed and arrested by Santiago. (Id. ¶¶ 22, 26; Santiago's Aff. (Doc. 41-1) ¶ 21.)

After arresting Plaintiff, Santiago "had concerns regarding her mental health" due to her "belligerence and aggressive behavior," and escorted Plaintiff "to the mental health reception area [(of the VA clinic)] for an assessment." (Santiago's Aff. (Doc. 41-1) ¶ 22.) Plaintiff was assessed by "Dr. Herman Diggs, a VA psychologist," (id. ¶ 23), and then was issued a citation for her criminal charges and released. (Id. ¶

_____

[4] During the time that Santiago was interviewing Cummings and reviewing security footage, Plaintiff was attending her physician's appointment. (Pl.'s Aff. (Doc. 47) ¶ 9.)

27; see also Pl.'s Aff. (Doc. 47) ¶ 36, 38.) Plaintiff asserts that her time in custody, from arrest to release, took "many hours." (Pl.'s Aff. (Doc. 47) ¶ 35.)

The statements of probable cause for Plaintiff's arrest show that she was charged with disorderly conduct under 38 C.F.R. § 1.218(b)(11), (see Pl.'s Ex. 1, Administrative Claim (Doc. 1-1) at 10), and delay, obstruct, and resisting an officer under N.C. Gen. Stat. § 14-223, (see id. at 13).[5] The statements further show that those charges stemmed from her actions during her encounter with Santiago near the clinic's entrance, and not from her earlier incident with Cummings at the kiosk in the clinic's lobby. (See id. at 10, 13.)

In addition to Plaintiff's Verified Complaint, (Compl. (Doc. 1)), several exhibits are before this court for review at summary judgment: Plaintiff's affidavit, (Pl.'s Aff. (Doc. 47)); Officer Santiago's affidavit, (Santiago's Aff. (Doc. 41-1)); and Plaintiff's administrative claim, (Pl.'s Ex. 1, Administrative Claim (Doc. 1-1)), which includes the statements of probable cause for her arrest, (id. at 10, 13), as well as Officer Santiago's and Lieutenant Nellis's contemporaneous reports about her arrest, (id. at 28–44). Plaintiff and Defendants also

---

[5] On December 23, 2019, both charges were dismissed with prejudice. (See Pl.'s Ex. 1, Administrative Claim (Doc. 1-1) at 15, 19.)

submitted security video footage that depicts Plaintiff's initial incident with Cummings in the VA lobby as well as her later encounter with Santiago near the entrance to the clinic. (See Pl.'s Ex. 3, Video Recordings (Doc. 1-3); Pl.'s Notice of Manual Filing (Doc. 4); Defs.' Br. in Supp. of Mot. for Summ. J. ("Defs.' Br.") (Doc. 41) at 2; Defs.' Notice of Manual Filing (Doc. 42).)[6]

Additional facts will be identified and addressed as necessary in the analysis to follow.

## II. **PROCEDURAL HISTORY**

Plaintiff filed her Verified Complaint on December 8, 2021, asserting five claims for relief: (1) Assault and Battery (against Santiago), (2) False Imprisonment (against Santiago and Nellis), (3) Malicious Prosecution (against Santiago and Nellis), (4) an unconstitutional seizure and use of force claim under the Fourth Amendment (against Santiago and Nellis), and

---

[6] The parties do not dispute that the videos submitted by each side are copies of one another, and authentic, despite that some of the videos are rotated or zoomed, and some are not. Throughout this Memorandum Opinion, the court will primarily cite to two videos: (1) Defs.' Video 1 Entitled "CHECK-IN (MAIN LOBBY)-2019-06-12-Hand grab at kiosk" and (2) Defs.' Video 4 Entitled "MAIN ENT W SIDE-2019-06-12-Kilo2 hands on." (See Defs.' Br. (Doc. 41) at 2.) However, this court views the video evidence, and draws inferences therefrom, "in the light most favorable" to Plaintiff. See Sedar v. Reston Town Ctr. Prop., LLC, 988 F.3d 756, 761 (4th Cir. 2021).

(5) a Bivens claim (against Santiago and Nellis). (See Compl.
(Doc. 1) at 6-9.)

Defendants filed a motion titled "Notice of Substitution,"
(Doc. 17), on April 27, 2022, requesting that the United States
of America be substituted as the defendant in place of Santiago
and Nellis for Claims I through IV. A magistrate judge in this
district filed an order granting that substitution for Claims I
through IV and announced that "Defendants Santiago and Nellis
still remain as individual Defendants on the Bivens claims in
Count V." (Doc. 23 at 1.)

Defendants filed a Motion to Dismiss on May 9, 2022. (Doc.
20.) This court issued a Memorandum Opinion and Order on March
7, 2023, granting in part and denying in part that motion. (Mem.
Op. and Order (Doc. 27).) This court granted the motion as to
Plaintiff's claim for Malicious Prosecution (Claim III). (Id.)
It also held that Plaintiff's Bivens claim (Claim V) was
duplicative of her standalone Fourth Amendment claim (Claim IV).
(Id.) It denied the motion as to Plaintiff's other claims,
allowing the parties to proceed to discovery on Plaintiff's
claims for Assault and Battery and False Imprisonment against
the United States, as well as her Fourth Amendment Bivens claim
for excessive force against Santiago.

- 8 -

Following discovery, on March 15, 2024, Defendants filed a Motion for Summary Judgement, (Doc. 40), and a brief in support of that motion, (Defs.' Br. (Doc. 41)). Plaintiff responded in opposition to the motion, (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Resp.") (Doc. 46)), and Defendants replied, (Defs.' Reply Br. in Supp. of Mot. for Summ. J. ("Defs.' Reply") (Doc. 48)).

## III. <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). This court's summary judgment inquiry is whether the evidence "is so one-sided that one party must prevail as a matter of law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-52 (1986). The moving party bears the initial burden of demonstrating "that there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp.</u>, 477 U.S. at 325. If the "moving party discharges its burden . . . , the nonmoving party then must come forward with specific facts showing that there is a genuine issue for trial." <u>McLean v. Patten Cmtys., Inc.</u>, 332 F.3d 714, 718-19 (4th Cir. 2003) (citing <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986)). "Conclusory or

speculative allegations do not suffice" to defeat

a motion for summary judgment. <u>Thompson v. Potomac Elec. Power</u>

<u>Co.</u>, 312 F.3d 645, 649 (4th Cir. 2002). Summary judgment should

be granted "unless a reasonable jury could return a verdict for

the nonmoving party on the evidence presented." <u>McLean</u>, 332 F.3d

at 719.

## IV.  <u>ANALYSIS</u>

This court previously noted that each of Plaintiff's claims

to survive 12(b)(6) is "predicated upon an initial unlawful

detention by Santiago." (Mem. Op. and Order (Doc. 27) at 8.)

Preliminary to the question of whether a detention is unlawful

is the question of <u>when</u> that detention occurred.

At the 12(b)(6) stage, Defendants appeared to concede that

Santiago's detention of Plaintiff began the moment he approached

her for a follow-up encounter near the clinic's entrance. (<u>See</u>

Doc. 22 at 14 ("[Santiago] was fulfilling his duty to

investigate the [dispute at the kiosk] when he approached

Plaintiff and detained her initially for less than 2

minutes.").) This court denied Defendants' Motion to Dismiss,

finding that it could not "determine from the record what

historical facts were known to Santiago at the time of the

detention," and thus, could not evaluate whether the detention

was "reasonable." (Mem. Op. and Order (Doc. 27) at 13.)

- 10 -

At summary judgment, both parties offer new evidence and arguments about the facts that were known to Santiago at the time, but appear to again agree that this encounter was a Terry stop from its outset and that its lawfulness should be analyzed under the "reasonable suspicion" standard of the Fourth Amendment based on the facts known to Santiago in the moment the encounter by the entrance began. (See Defs.' Br. (Doc. 41) at 12–16; Pl.'s Resp. (Doc. 46) at 11–18.)

Determining the temporal beginning of Plaintiff's detention is necessary to deciding what facts were known to Santiago at that time, and whether those facts create reasonable suspicion necessary to conduct a lawful detention. After careful review of the record and application of the legal standard discussed below, see United States v. Jones, 678 F.3d 293, 298–300 (4th Cir. 2012), this court finds that Santiago's detention of Plaintiff did not occur until roughly two minutes into their follow-up encounter near the clinic's entrance.

## A.  **Santiago's conversation with Plaintiff near the clinic's entrance began as a consensual police-citizen encounter and transformed into a detention roughly two minutes into the encounter.**

Under the Fourth Amendment, "[p]olice-citizen encounters that are consensual require no justification." Id. at 299. Only "those that are not consensual impose a detention on a citizen

- 11 -

and so must be supported by an officer's reasonable, articulable suspicion." Id.

"As a general matter, law enforcement officers do not effectuate a detention or seizure merely by approaching individuals on the street or in other public places and putting questions to them." Id. (internal quotation marks and citation omitted). "[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." Id. "This reasonable person standard is an objective one, thus, its proper application is a question of law." Id. (internal quotation marks and citations omitted). Courts consider the "totality of circumstances" when deciding whether a reasonable person would

believe they are not free to leave. Id. at 300.[7]

After Santiago initially conversed with Plaintiff about the kiosk incident, he departed to review security footage and interview Cummings, and then again located Plaintiff near the clinic's entrance and approached her for a follow-up conversation. (Santiago's Aff. (Doc. 41-1) ¶¶ 5-6, 9-10; Pl.'s Aff. (Doc. 47) ¶¶ 10-11.)[8]

Plaintiff recounts in her affidavit that she and Santiago "calmly converse[d] for about two minutes." (Pl.'s Aff. (Doc. 47) ¶ 11.) Plaintiff informed Santiago "that [she] was looking

_____

[7] Factors the Fourth Circuit considers include:

(i) the number of police officers present; (ii) whether the police officers were in uniform; (iii) whether the police officers displayed their weapons; (iv) whether they touched the defendant or made any attempt to physically block his departure or restrain his movement; (v) the use of language or tone of voice indicating that compliance with the officer's request might be compelled; (vi) whether the officers informed the defendant that they suspected him of illegal activity rather than treating the encounter as routine in nature; and (vii) whether, if the officer requested from the defendant ... some form of official identification, the officer promptly returned it.

United States v. Peters, 60 F.4th 855, 862-63 (4th Cir. 2023).

[8] Plaintiff explains in her affidavit that she was waiting near the clinic's entrance because her physician, Dr. Stanley, had noticed that Plaintiff was still "upset" by the incident with Cummings during their appointment and "agreed to arrange for a uniformed escort so that [Plaintiff] could exit the clinic safely." (Pl.'s Aff. (Doc. 47) ¶ 10.)

- 13 -

for an escort to [her] car." (Id.) Plaintiff states that
Santiago "did not acknowledge" her statement and, rather,
"lectured" her about "show[ing] proper respect for Cummings."
(Id.) She also states that he "did not ask [her] any questions,"
"did not ask [her] for identification," and did not indicate
"that he was investigating any crime, or that he suspected [her]
of committing any crime." (Id.) Finally, "Santiago did not tell
[her] that [she] was not free to leave." (Id. ¶ 12.) Once
Plaintiff "got tired" of the conversation and "realized that
Santiago did not intend to escort [her] to [her] car," she
"completed the conversation and tried to go to [her] car." (Id.)
As she attempted to leave, "Santiago blocked [her] from leaving
by physically restraining [her]" and "would not allow [her] to
leave." (Id. ¶ 13.)

In his own affidavit, Santiago describes the first two
minutes of his encounter with Plaintiff as such: "After
[interviewing Cummings], I returned to the lobby to speak with
[Plaintiff], near the entrance of the clinic." (Santiago's Aff.
(Doc. 41-1) ¶ 10.) "I told [Plaintiff] that I was still
reviewing the security footage and that I had spoken with Mr.
Cummings." (Id. ¶ 11.) "[Plaintiff] became irate and began
cursing," calling Santiago a "piece of shit fuckface," among
other insults. (Id.) Santiago asserts that he "attempted to

- 14 -

deescalate the situation," (id.), but that after he "cautioned [Plaintiff] that she did not have the right to take [Cummings'] identification card," she "became belligerent" and "continued cursing and began screaming," such that she was "heard by VA staff and other veterans throughout the lobby and in nearby departments." (Id. ¶ 12.) Santiago "requested [Plaintiff's] identification information," but she "refused to provide [it] and continued to cause a disturbance . . . and then attempted to leave." (Id. ¶ 13.) At this moment, Santiago "decided to temporarily detain [Plaintiff]" and "advised [her] that she was not free to leave." (Id. ¶ 14.)

Squaring each party's recounting of the first two minutes of their encounter, it is uncontroverted that Santiago approached Plaintiff by the clinic's entrance and initiated conversation about her earlier incident with Cummings at the kiosk. (Pl.'s Aff. (Doc. 47) ¶ 11; Santiago's Aff. (Doc. 41-1) ¶¶ 10–11.) It is also uncontroverted that roughly two minutes into the conversation, Plaintiff attempted to leave, and Santiago positioned his body to block her departure, (Pl.'s Aff. (Doc. 47) ¶¶ 12–13; Santiago's Aff. (Doc. 41-1) ¶ 14), which led to a physical confrontation that culminated in Plaintiff's arrest, (Pl.'s Aff. (Doc. 47) ¶¶ 13–14; Santiago's Aff. (Doc. 41-1) ¶¶ 17–21).

The video footage submitted by the parties corroborates the parties' timeline in that, for roughly one minute and forty-five seconds, Santiago and Plaintiff engaged in conversation near the clinic's entrance before Plaintiff appears to try to step around Santiago to depart. (See Defs.' Video 4 Entitled "MAIN ENT W SIDE-2019-06-12-Kilo2 hands on" at 00:05-01:50.) As Plaintiff attempted to depart, Santiago blocked her exit. (Id. at 01:50-4:30.)

This court finds that the follow-up encounter near the entrance was initially consensual, and Plaintiff was not "detained" within the meaning of the Fourth Amendment until approximately two minutes into the interaction when she attempted to depart, and Santiago positioned his body to physically block her exit. See Torres v. Madrid, 592 U.S. 306, 325 (2021) (holding that an officer's use of physical force with intent to restrain effectuates a seizure).

By Plaintiff's recounting, during the first two minutes, Santiago did not ask her questions, did not ask for identification, did not indicate that he was investigating a crime, and did not tell her that she was not free to leave. (See Pl.'s Aff. (Doc. 47) ¶¶ 11-12.) While an officer need not engage in each of these actions to effectuate a detention, the absence of all of them cuts sharply in favor of this being a consensual

- 16 -

encounter. Santiago's description of the first two minutes also reflects a consensual encounter. He asserts that he conversed back and forth with Plaintiff during those two minutes, (see Santiago's Aff. (Doc. 41-1) ¶¶ 11–12); see also Jones, 678 F.3d at 299, before he "requested [her] identification information," she "attempted to leave," and he "decided to temporarily detain" her, (Santiago's Aff. (Doc. 41-1) ¶¶ 13–14).

The only facts that point slightly in favor of the first two minutes of the encounter constituting a detention are that Santiago was dressed in uniform and was positioned between Plaintiff and the exit. (See Defs.' Video 4 Entitled "MAIN ENT W SIDE-2019-06-12-Kilo2 hands on" at 00:05-01:50.) However, whether an officer is in uniform is only one among many factors a court considers in determining the line between a voluntary encounter and a detention, see Peters, 60 F.4th at 862–63, and here, although in uniform, Santiago approached Plaintiff alone – a lesser show of force compared to situations where multiple uniformed officers surround a suspect. Additionally, Santiago's positioning between Plaintiff and the doorway appears to be the product of his walking up to and greeting Plaintiff where she happened to be standing at that moment, rather than any concerted effort on his part to block her or otherwise signal

- 17 -

that she was not free to leave. (See Defs.' Video 4 Entitled "MAIN ENT W SIDE-2019-06-12-Kilo2 hands on" at 00:05.)

In sum, considering the totality of the circumstances, a "reasonable person" would not believe that Santiago's conduct during the first part of the encounter meant that Plaintiff was not free to leave. It was only when Santiago began to physically block Plaintiff's departure, roughly two minutes into their conversation, that the encounter transitioned into a detention. Cf. Peters, 60 F.4th 855, 863 (finding that two uniformed officers approaching a suspect, with service weapons holstered, speaking in "stern" and "authoritative" tones, did not effectuate a detention until the moment, roughly a minute into the encounter, when one of the officers "threatened to exercise his authority to take [the suspect] to jail for trespass and suggested that [the suspect] should consent to a pat down").

**B. At the time of this detention, Santiago possessed reasonable suspicion that Plaintiff had been involved in criminal activity during her earlier incident with Cummings at the VA lobby kiosk.**

"To be constitutional, a warrantless investigatory detention generally requires a reasonable and articulable suspicion that the person seized is engaged in criminal activity." Walker v. Donahoe, 3 F.4th 676, 682 (4th Cir. 2021) (internal quotation marks and citations omitted). Reasonable suspicion requires "more than an inchoate and unparticularized

- 18 -

suspicion or hunch of criminal activity" but is "a low bar" that requires "a showing considerably less than preponderance of the evidence." <u>United States v. Smart</u>, 91 F.4th 214, 223 (4th Cir. 2024) (internal quotation marks and citations omitted). "To establish a reasonable suspicion of criminal activity, an officer must identify specific and articulable facts that demonstrate at least a minimal level of objective justification for the belief that criminal activity is afoot." <u>Id.</u> (internal quotation marks and citations omitted). In deciding whether an officer possessed reasonable suspicion of criminal activity, a court assesses the facts, "both individually and in their totality," that were known to the officer at the time of the detention. <u>Id.</u>

Defendants argue that Santiago's detention of Plaintiff was constitutional because he possessed reasonable suspicion that she had been involved in criminal activity during her prior incident with Cummings at the kiosk. (Defs.' Br. (Doc. 41) at 14–15.) The information known to Santiago about Plaintiff's prior incident with Cummings is reflected in the following facts:

Santiago received "a report from dispatch that a female veteran had reported being assaulted by another veteran in the lobby [(of the VA clinic)]." (Santiago's Aff. (Doc. 41-1) ¶ 3.)

- 19 -

Santiago reported to the lobby where a VA volunteer (Karin Dalkey) informed him that "a female veteran" (Plaintiff) "wanted to report an assault on her by another veteran" (Lt. Colonel Cummings). (Id. ¶ 4.)

Santiago located Plaintiff in the lobby and initiated a conversation. (Id. ¶ 5.) According to Santiago, Plaintiff stated that Cummings had "aggressively grabbed her wrist" and threatened her. (Id.) Plaintiff attests that she told "Santiago to forget about" the incident, (Pl.'s Aff. (Doc. 47) ¶ 9), but does not dispute that she told Santiago a veteran had "aggressively grabbed her wrist," (see generally id.).

After Santiago spoke with Plaintiff in the lobby, he interviewed Cummings. Cummings informed Santiago that Plaintiff "yell[ed] at him while he was at a check-in kiosk, and then took his veteran identification card out of the kiosk he was using." (Santiago's Aff. (Doc. 41-1) ¶ 9). Additionally, Cummings stated that he "took his identification card back from" Plaintiff and told her he would "report her to the police" if she took it again. (Id.) Finally, Cummings stated that he had no further contact with Plaintiff after this interaction at the kiosk. (Id.)

Santiago also reviewed security video footage of the kiosk incident. (See id. ¶¶ 6-7 (Specifically, Santiago reviewed the

video that has been referred to as "Video 1" throughout this action.); see also Defs.' Br. (Doc. 41) at 2.) The video footage shows Plaintiff and Cummings standing side-by-side in the VA clinic's lobby in front of a line of kiosks, each apparently waiting for other patrons to finish, and for a kiosk to open. (Defs.' Video 1 Entitled "CHECK-IN (MAIN LOBBY)-2019-06-12-Hand grab at kiosk" at 00:03-00:12.) When a kiosk opened, Cummings stepped forward to use it. (Id. at 00:12-00:15.) Plaintiff followed closely behind Cummings, positioned herself adjacent to Cummings and the kiosk, and engaged Cummings in conversation. (Id. at 00:16-00:22.) Cummings took out his VA identification card and inserted it in the kiosk. (Id. at 00:23-00:24.) Plaintiff reached forward and removed his card from the kiosk. (Id. at 00:28-00:29.) Almost simultaneously, Cummings also reached forward and appeared to briefly grab, or brush, Plaintiff's wrist as he retrieved his identification card from her clutch. (Id. at 00:29.) Plaintiff and Cummings exchanged more words, (id. at 00:30-00:35), and then Cummings walked away, circled around the lobby, and returned to the line of kiosks to use a different kiosk while Plaintiff continued to use the kiosk that was the source of their dispute, (id. at 00:35-01:15). In total, the incident between Cummings and Plaintiff lasted around nineteen seconds. (Id. at 00:16-00:35.)

- 21 -

After Santiago reviewed this video footage and completed his interview with Cummings, he sought out Plaintiff "to speak with" her and located her "near the entrance of the clinic." (Santiago's Aff. (Doc. 41-1) ¶ 10.) Santiago's conversation with Plaintiff near the clinic's entrance began as a voluntary encounter, (see supra Section IV.A), but roughly two minutes into the encounter, Santiago attempted to "temporarily detain [Plaintiff] as part of [his] investigation." (Id. ¶ 14.) In accordance with the Fourth Amendment's requirements for an officer to conduct an investigatory detention, this court must determine whether Santiago had "reasonable suspicion of criminal activity," Smart, 91 F.4th at 223, based upon the facts known to him at the time regarding Plaintiff's incident with Cummings at the kiosk.[9]

---

[9] There are no undisputed facts about Plaintiff's conduct during the two-minute voluntary encounter preceding her detention that contribute to this court's reasonable suspicion analysis. For one, Santiago does not aver that he learned any new facts about the kiosk incident during those two minutes. (See generally Santiago's Aff. (Doc. 41-1).) Two, while Santiago attests that Plaintiff became "irate" and "belligerent" and screamed curses and insults at him that caused a disturbance "throughout the lobby" during those two minutes, (Santiago's Aff. (Doc. 41-1) ¶¶ 11-12), Plaintiff disputes this characterization and asserts that she and Santiago "calmly converse[d]," (Pl.'s Aff. (Doc. 47) ¶ 11), opining that she "had not created any disturbance," (id. ¶ 12). The video footage submitted by the parties does not resolve these disputes. At summary judgment, this court focuses its reasonable suspicion inquiry on the facts that were known to Santiago before the encounter occurred.

Defendants initially cited four facts that informed Santiago's decision to detain Plaintiff: (1) "Plaintiff had reported being the victim of an assault, but the security video that apparently captured the event she was referring to, did not show any assault on her;" (2) Plaintiff "had briefly and intentionally taken another veteran's property without his permission, and therefore Officer Santiago suspected her of committing theft;" (3) Santiago "needed to properly identify Plaintiff and run a warrants search;" and (4) Santiago "had personally observed Plaintiff create a loud disturbance and become disorderly in the lobby of the clinic." (Defs.' Br. (Doc. 41) at 14–15.)[10] Based on the totality of circumstances, Defendants contend "these facts easily amount to reasonable suspicion." (Id. at 15.)

Plaintiff argues in her response that Santiago already possessed her identifying information prior to the detention and, therefore, Santiago's third cited fact — that he "needed to properly identify Plaintiff and run a warrants search" — cannot

_____

[10] Although Defendants characterize these as four "facts," several of these "facts" appear to describe independent grounds for an investigatory detention. For example, an analysis of the second "fact" – that Santiago suspected Plaintiff of committing theft – itself, requires analyzing all of the factual inferences that can be drawn from the video footage, and from Cummings' interview, to determine if Santiago possessed reasonable suspicion of theft.

justify his decision to detain Plaintiff. (Pl.'s Resp. (Doc. 46) at 9.) In reply, Defendants concede that Santiago's plan to use the stop to identify Plaintiff and run a warrants search is not relevant to the analysis of "whether the stop was lawful in the first place." (Defs.' Reply (Doc. 48) at 8.) Thus, Defendants abandoned "identify[ing] Plaintiff and run[ning] a warrants search" as a justification for the stop but maintain on reply that the detention was based on "reasonable suspicion" that Plaintiff was involved in three crimes: (1) a possible assault, (2) a possible theft, and (3) possible disorderly conduct. (Id. at 3.)

### i. Suspicion of Assault

Proceeding with its analysis of Defendants' three cited grounds for Santiago's decision to detain Plaintiff, this court starts by noting that the first ground — Plaintiff's involvement in a possible assault — is inapposite to the other two in that the "possible assault" was committed against Plaintiff rather than by Plaintiff. Defendants' position at summary judgment concerning Plaintiff's "involve[ment] in . . . a possible assault," and how this contributes to a reasonable suspicion analysis, is not readily apparent to this court. (See Defs.' Reply (Doc. 48) at 3.)

At the 12(b)(6) stage, Defendants argued that Santiago had authority to stop Plaintiff because he needed to pursue investigation into an alleged assault against Plaintiff. (See Doc. 22 at 13-14; Doc. 26 at 2-4). In support of this argument, Defendants cited to Brown v. Texas, 443 U.S. 47 (1979), and Jones v. Alvarez, No. 1:19-cv-930, 2021 WL 796509, at *9 (M.D.N.C. March 2, 2021). (See Doc. 22 at 13-14.) To the extent Defendants intend to revive this legal argument at summary judgment, the record does not support their position.

In Brown v. Texas, police officers detained an individual for the purpose of "requiring him to identify himself," and the Supreme Court found that a detention on these grounds constitutes a Fourth Amendment seizure. See Brown, 443 U.S. at 50. In making this finding, the Court emphasized that the Fourth Amendment "applies to all seizures . . . including seizures that involve only a brief detention short of traditional arrest." Id. (citation omitted). It further advised: "The reasonableness of seizures that are less intrusive than a traditional arrest depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." Id. (internal quotation marks and citations omitted).

Although the Brown opinion focused on a seizure where the detainee was suspected to be a perpetrator of criminal activity, see id. at 51-52, as is typical for investigatory detentions, some courts have since applied the factors articulated in Brown to decide the lawfulness of "suspicionless stops," or stops that are conducted for reasons other than suspicion that the detainee is perpetrating criminal activity. See, e.g., Lincoln v. Turner, 874 F.3d 833, 844 (5th Cir. 2017) (invoking the factors to evaluate the lawfulness of a detention for a suspected witness to a crime). The Brown factors include (1) "the gravity of the public concerns served by the seizure," (2) "the degree to which the seizure advances the public interest," and (3) "the severity of the interference with individual liberty." Brown, 443 U.S. at 50-51.

Following that approach, this court applied the Brown factors in Jones v. Alvarez, 2021 WL 796509, at *9, and ruled that the plaintiff in that case, Jones, had not plausibly alleged an unconstitutional detention, id. Like here, the circumstances of Jones' detention "implicate[d] the authority of law enforcement to detain an individual complaining of criminal activity rather than one suspected of criminal activity." Id. Unlike here, Jones clearly initiated the encounter when he approached the officer and "pleaded for help," id., whereas

- 26 -

Plaintiff denies that she sought Santiago's help and asserts, instead, that she informed Santiago "to forget about [the assault]" because "[i]t was over." (Pl.'s Aff. (Doc. 47) ¶ 9.) Defendants do not contest Plaintiff's assertion.

Even beyond this distinction, other circumstances present in Jones are not present here. In Jones, this court found that (1) the gravity of the public concern was substantial because Jones claimed to have been the victim of a "brutal" assault, (2) the public interest was substantial because the officer needed to identify Jones in order to initiate an investigation into assault, and (3) the interference with Jones's liberty was minimal because Jones was simply commanded to remain in a specified spot while the officer assessed what to do next. Jones, 2021 WL 796509, at *9.

Meanwhile, here, the video footage reviewed by Santiago shows that if there was an assault on Plaintiff when Cummings briefly grabbed Plaintiff's wrist to retrieve his card, that assault was certainly not "brutal." (Defs.' Video 1 Entitled "CHECK-IN (MAIN LOBBY)-2019-06-12-Hand grab at kiosk" at 00:29.) Additionally, while Santiago claims he needed to "properly identify [Plaintiff] and run a warrants check," (Santiago's Aff. (Doc. 41-1) ¶ 13), he does not dispute Plaintiff's assertion that she had already "[given] Santiago [her] identification

information during the first conversation [she] had with him,"
(see Pl.'s Aff. (Doc. 47) ¶ 9), making the urgency of the
"public interest" less severe than in Jones. And finally, the
interference with Plaintiff's liberty here was greater than in
Jones because Santiago detained Plaintiff by physically blocking
her, (Pl.'s Aff. (Doc. 47) ¶ 13), as opposed to by verbal
command, see Jones, 2021 WL 796509, at *9.

In sum, to the extent Defendants intended to reincorporate
their arguments concerning Brown and Jones at the summary
judgment stage, the record does not support a finding that a
"suspicionless stop" — conducted to pursue an ongoing
investigation into an alleged assault against Plaintiff — was
reasonable.

However, as mentioned above, it is not clear that
Defendants intended to revive their Brown and Jones argument at
summary judgment. Instead, at summary judgment, Defendants
emphasize that Santiago had already determined that Plaintiff
was not assaulted prior to confronting her by the entrance to
the clinic, which undermines any argument that this detention
was necessary to pursue an ongoing investigation into assault.
(See Defs.' Br. (Doc. 41) at 15 ("[T]he security video . . . did
not show any assault on her."); id. ("[Santiago] reviewed
security video of the event and determined the video not only

did not show an assault, it showed Plaintiff confronted the other veteran and took his property without permission."); see also Defs.' Reply (Doc. 48) at 4–5.)

Defendants' position at summary judgment, it appears, is not that investigating assault was a justification for Plaintiff's detention, but rather, that Santiago's determination prior to the detention that an assault did not occur, is a factual point that supports his "reasonable suspicion" that Plaintiff was the criminal wrongdoer. Restated, Defendants' position seems to be that a reasonable officer viewing the security footage would conclude that Plaintiff, not Cummings, was the aggressor and criminal wrongdoer during the incident at the kiosk. (See Defs.' Reply (Doc. 48) at 5).)

Taking that position under advisement, this court proceeds to its analysis of whether Santiago possessed reasonable suspicion that Plaintiff committed crimes of theft and disorderly conduct during her incident with Cummings at the kiosk.

### ii.  **Suspicion of Theft**

Defendants argue that "Plaintiff had briefly and intentionally taken another veteran's property without his permission, and therefore Officer Santiago suspected her of committing theft." (Defs.' Br. (Doc. 41) at 15.) Santiago was

notified of a possible theft when Cummings informed Santiago during his interview that Plaintiff "took his veteran identification card out of [the] kiosk he was using." (Santiago's Aff. (Doc. 41-1) ¶ 9.) Santiago also reviewed security footage of the incident. (Id. ¶ 6.)

Plaintiff contends that Santiago's suspicion of theft was not reasonable. Specifically, Plaintiff argues that "Santiago could not have formed a reasonable suspicion" because "at least two of four essential elements of larceny [were] not met." (Pl.'s Resp. (Doc. 46) at 8–9.) Defendants reply that "[r]easonable suspicion is a low bar," (Defs.' Reply (Doc. 48) at 6 (quoting Smart, 91 F.4th at 223)), and that Plaintiff's focus on the elements of larceny "conflates showing reasonable suspicion with proving the elements of a crime," (id.).

Reasonable suspicion is a "less demanding standard than probable cause." United States v. Mitchell, 963 F.3d 385, 390 (4th Cir. 2020) (quoting Illinois v. Wardlow, 529 U.S. 119, 123 (2000)). Because even probable cause "does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction," Sennett v. United States, 667 F.3d 531, 535 (4th Cir. 2012) (citation omitted), it is true that Santiago need not "prov[e] the elements of [the] crime" in order to meet the lower bar of reasonable suspicion.

- 30 -

(Defs.' Reply (Doc. 48) at 6.) Instead, Defendants need only "identify specific and articulable facts that demonstrate at least a minimal level of objective justification for [Santiago's] belief" that Plaintiff committed a theft offense. Smart, 91 F.4th at 223 (internal quotation marks and citations omitted). The articulable facts drawn from Cummings' interview and the video footage provided Santiago with that objective justification.

Under North Carolina law, larceny is "(1) the taking of the property of another; (2) carrying it away; (3) without the owner's consent; and (4) with the intent to permanently deprive the owner of the property." State v. Hill, 291 N.C. App. 633, 642, 896 S.E.2d 216, 223 (2023). "[T]he element of taking is complete . . . at the moment a thief first exercises dominion over the property." State v. Sumpter, 318 N.C. 102, 111, 347 S.E.2d 396, 401 (1986); see also State v. Carswell, 296 N.C. 101, 104, 249 S.E.2d 427, 429 (1978) (explaining that "taking" occurs when a thief has control of the item "even if only for an instant"). Moreover, "[a] bare removal from the place in which [a thief] found the goods, though the thief does not quite make off with them, is a sufficient asportation, or carrying away." Carswell, 296 N.C. at 103, 249 S.E.2d at 428 (quoting 4 W. Blackstone, Commentaries 231); see also id. at 104-05 (upholding

- 31 -

larceny conviction of a defendant who moved an air conditioner "four to six inches" away from the spot where he found it). Thus, even "the slightest taking and movement of property," when done without the owner's consent and with the intent to permanently deprive the owner, constitutes a larceny. See State v. Barnes, 345 N.C. 146, 149–50, 478 S.E.2d 188, 191 (1996) (citation omitted).

Plaintiff asserts in her affidavit that she "did not want Cummings' VA card" and that she merely "pulled his card out of the kiosk, and offered it to [him]," (Pl.'s Aff. (Doc. 47) ¶¶ 5, 8). Plaintiff argues it was not reasonable for Santiago to believe that she "carr[ied] the card away" or that she intended "to deprive Cummings of his card permanently," (Pl.'s Resp. (Doc. 46) at 14).

However, Plaintiff's assertions about her subjective intent were not facts known to Santiago at the time of his decision to detain Plaintiff. The relevant facts known to Santiago at the time were (1) that Cummings had stated Plaintiff "took his veteran identification card out of the kiosk he was using" and that he "took [it] back from [her]," (Santiago's Aff. (Doc. 41-1) ¶ 9), not that she "offered it to [him]," (Pl.'s Aff. (Doc. 47) ¶ 5), and (2) the facts and reasonable inferences that can be discerned from a review of the video footage.

- 32 -

Santiago asserts that his subjective conclusion from reviewing the video footage was that "Cummings quickly grab[bed] [Plaintiff's] arm and retrieve[d] his card from her hand," (Santiago's Aff. (Doc. 41-1) ¶ 7). However, the reasonable suspicion standard is an objective one. This court finds that Plaintiff's actions at the kiosk – specifically, whether or not she proactively offered the card back to Cummings — is not readily discernable from the footage due to the brevity of the exchange, graininess of the footage, and distant vantage point of the security camera. (See Defs.' Video 1 Entitled "CHECK-IN (MAIN LOBBY)-2019-06-12-Hand grab at kiosk" at 00:28-00:29.)

Returning to the four elements of larceny, the footage clearly establishes that Plaintiff took the property of another (Element One) and carried it away (Element Two) when she grabbed Cummings' card out of the kiosk, even if this grab amounted to only a "slight[] taking and movement of property." See Barnes, 345 N.C. at 149–50, 478 S.E.2d at 191. Cummings' interview corroborated these facts. (See Santiago's Aff. (Doc. 41-1) ¶ 9.) It also provided Santiago with the fact that Plaintiff took the card without Cummings' consent (Element Three). (Id.) Thus, the only element of larceny unsubstantiated by articulable facts known to Santiago at the time was whether Plaintiff intended "to

permanently deprive" Cummings of the card. See Hill, 291 N.C. App. at 642, 896 S.E.2d at 223.

Although the fourth element of larceny was not readily discernible to Santiago, a reasonable officer in Santiago's shoes could still point to "specific and articulable facts that demonstrate at least a minimal level of objective justification for the belief" that Plaintiff committed larceny. See Smart, 91 F.4th at 223 (internal quotation marks and citations omitted) (emphasis added). That is, three of the four elements of larceny were plainly present. Questioning a suspect further about what appears to be a theft — Santiago contends he advised Plaintiff that taking the card was a theft. is the exact sort of undertaking that an officer may pursue through an investigatory detention. Here, the "low bar" of reasonable suspicion is met. See id.

### iii. **Suspicion of Disorderly Conduct**

Defendants also argue that Santiago possessed reasonable suspicion that Plaintiff had committed a disorderly conduct offense when she reportedly yelled at Cummings during the incident at the kiosk. (Defs.' Br. (Doc. 41) at 15; Defs.' Reply (Doc. 48) at 7–8.)

While Defendants do not cite a specific statute, this court presumes that Santiago's suspicion of disorderly conduct refers

- 34 -

to suspicion that Plaintiff violated 38 C.F.R. § 1.218.[11] The federal code prohibits "disorderly conduct" at VA facilities, including "fighting, threatening, violent, or tumultuous behavior, unreasonable noise or coarse utterance, gesture or display or the use of abusive language to any person present." 38 C.F.R. § 1.218(a)(14)(ii). It additionally prohibits "[d]isorderly conduct which . . . tends to impede or prevent the normal operation of a service or operation of the facility." 38 § 1.218(b)(11). The offense is a misdemeanor. See id. (explaining that the penalties include arrest, removal, fine and – in some cases – a term of imprisonment "not more than six months").

In their opening brief at summary judgment, Defendants contended that "Officer Santiago had personally observed Plaintiff create a loud disturbance and become disorderly in the lobby of the clinic." (Defs.' Br. (Doc. 41) at 8 (citing Santiago's Aff. (Doc. 41-1) ¶ 15).) Plaintiff argued in response that Santiago could not have "personally observed" Plaintiff's incident with Cummings in the lobby because, by his own

---

[11] This suspected disorderly conduct offense — Plaintiff reportedly yelling at Cummings at the kiosk — is distinct from the disorderly conduct offense Plaintiff was eventually arrested for and charged with under 38 C.F.R. § 1.218. Plaintiff's arrest resulted from her physical confrontation with Santiago near the clinic's entrance after he attempted to detain her.

admission, "he had to be summoned there by 'dispatch.'" (Pl.'s
Resp. (Doc. 46) at 15-16.) In reply, Defendants concede that
Santiago was not physically present in the lobby to witness
Plaintiff's incident with Cummings. Instead, Santiago's
suspicion of Plaintiff's disorderly conduct came from Cummings'
statement to Santiago "that Plaintiff had yelled at him."
(Defs.' Reply (Doc. 48) at 3; see also id. (clarifying that
Santiago's suspicion of disorderly conduct came from what "the
other veteran [(Cummings)] had stated to him").)

It is a close call whether Cummings' statement to Santiago
"that Plaintiff had yelled at him" and "took his veteran
identification card," alone, is sufficient to provide Santiago
with the reasonable suspicion "that Plaintiff may have been
disorderly and created a loud disturbance, thereby possibly
committing a misdemeanor offense." (Defs.' Reply (Doc. 48) at 7-
8; see also Santiago's Aff. (Doc. 41-1) ¶ 9). However, the
weight of Cummings' statement is augmented by the Fourth
Circuit's recognition that face-to-face informants – like
Cummings – can be reliable sources of information for officers
because officers have "the opportunity to observe [their]
credibility and demeanor," Mitchell, 963 F.3d at 394, and can
hold them "accountable for false statements[,]" id. at 393.

In addition to Cummings' statement that Plaintiff yelled at him and took his card, Santiago also reviewed video footage of the kiosk incident. That footage, Plaintiff argues, cuts against reasonable suspicion. (See Pl.'s Resp. (Doc. 46) at 16.) Specifically, Plaintiff argues that the footage provides no visible clues of a "loud disturbance," because the surrounding patrons "do not appear to be disturbed, distracted, or to even notice the interaction between [Plaintiff] and Cummings." (Id.)

However, the footage also confirms that Plaintiff grabbed Cummings' identification card out of the kiosk, which supports the inference that Plaintiff acted in an aggressive manner and caused at least some sort of disturbance in the lobby. Whether Plaintiff's actions as shown in the video footage fit neatly into the definitions of "disorderly conduct" under the federal regulation is unclear, but paired with Cummings' statement that Plaintiff "yell[ed]" at him, this court finds that Santiago possessed reasonable suspicion that Plaintiff committed a disorderly conduct offense. That is, Cummings' statement, and the video footage, together, provided Santiago with "specific and articulable facts that demonstrate at least a minimal level of objective justification" for the belief that Plaintiff committed a misdemeanor disorderly conduct offense at the kiosk.

<u>Smart</u>, 91 F.4th at 223 (internal quotation marks and citations omitted).

### iv. <u>Whether an officer can detain a suspect to investigate completed offenses</u>

It does not automatically follow that Santiago's reasonable suspicion of theft and disorderly conduct justified his investigatory detention of Plaintiff. In this case, almost two hours passed between Plaintiff's incident at the kiosk and the time that Santiago detained her. (<u>See</u> Pl.'s Resp. (Doc. 46) at 6 (citing Pl.'s Aff. (Doc. 47) ¶ 11); <u>Compare</u> Defs.' Video 1 Entitled "CHECK-IN (MAIN LOBBY)-2019-06-12-Hand grab at kiosk" (showing 1:24 p.m. as time of kiosk incident), <u>with</u> Defs.' Video 4 Entitled "MAIN ENT W SIDE-2019-06-12-Kilo2 hands on" (showing 3:12 p.m. as time of encounter by clinic entrance).) Some courts, in addressing reasonable suspicion of a completed offense, have distinguished between a felony and a misdemeanor.

In <u>United States v. Hensley</u>, 469 U.S. 221 (1985), the Supreme Court announced a categorical rule regarding the constitutionality of investigatory stops for already completed felonies: "[I]f police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in . . . a completed felony, then a <u>Terry</u> stop may be made to investigate that suspicion." <u>Hensley</u>, 469 U.S. at 229.

However, the Supreme Court did not extend that categorical rule to completed misdemeanors. Id.

Post-Hensley, some circuit courts have adopted balancing tests to determine the constitutionality of completed misdemeanor stops, weighing factors such as "the nature of the crime, how long ago the suspect committed it, and the ongoing risk of the individual to the public safety." See Brown, 114 F.4th 253, 267 (4th Cir. 2024) (Wynn, J., dissenting); see also United States v. Jones, 953 F.3d 433, 435-38 (6th Cir. 2020) (applying balancing test); United States v. Hughes, 517 F.3d 1013, 1016-19 (8th Cir. 2008) (same); United States v. Moran, 503 F.3d 1135, 1141-43 (10th Cir. 2007) (same). However, the Fourth Circuit has neither expressly adopted a balancing test nor clarified the standard to be applied within this circuit. See Brown, 114 F.4th at 267 (Wynn, J., dissenting) (stating that the Fourth Circuit has never addressed "whether the investigation of a completed misdemeanor may justify an investigatory Terry stop"); see also id. at 258 n.4 (majority opinion) (noting that because the appellant did not specifically raise the issue of completed misdemeanors on appeal, the court did not need to "resolv[e] this unpreserved argument").

In the present case, Defendants concede that Plaintiff's suspected disorderly conduct offense at the kiosk was a

- 39 -

"misdemeanor offense." (Defs.' Reply (Doc. 48) at 8.) However, Defendants argue the suspected larceny was a felony offense, (see Defs.' Suppl. Br. (Doc. 66) at 6–7), and therefore, the categorical rule announced in Hensley applies.

Under North Carolina law, a larceny is a felony if the stolen item was taken "from the person" of the property owner, regardless of the monetary value of that item. See N.C. Gen. Stat. § 14-72(b)(1).[12] "From the person" is "regularly understood to include the taking of property from one's presence and control," meaning, "in the immediate presence of and under the protection or control of the victim." Barnes, 345 N.C. at 149, 478 S.E.2d at 190 (quotation marks and citations omitted). North Carolina courts recognize that property may be "under the protection" of the victim even when "not actually 'attached' to him." State v. Buckom, 328 N.C. 313, 317–18, 401 S.E.2d 362, 365 (1991) (citation omitted). It is enough that the item is "under the [victim's] eye" at the time of the taking. Id.; see also State v. Greene, 251 N.C. App. 627, 633–34, 795 S.E.2d 815, 820 (2017) (explaining that the "essence of larceny from the person" is the "person's awareness at the time of the taking").

---

[12] "The reason the crime of larceny from a person is afforded special consideration is to protect the person or immediate presence of the victim from invasion." Barnes, 345 N.C. at 150, 478 S.E.2d at 191 (quoting 50 Am.Jur.2d Larceny § 54 (1995)).

In the present case, Cummings had just inserted his VA card into the kiosk, positioned directly in front of him, at the time that Plaintiff grabbed it. Although the card was not "attached" to Cummings, it was in his immediate presence and under his protection and control, which are facts sufficient to support reasonable suspicion of <u>felony</u> larceny. <u>Cf.</u> <u>Buckom</u>, 328 N.C. at 317–18, 401 S.E.2d at 365 (1991) (affirming a felony larceny conviction for a defendant who reached into and removed money from a cash register positioned between himself and the store clerk, finding this to be "from the person").

This court finds that Santiago had reasonable suspicion that Plaintiff had committed a misdemeanor disorderly conduct offense and a felony larceny roughly two hours prior to her investigatory detention. Applying the categorical rule announced in <u>Hensley</u>, Santiago's detention of Plaintiff was constitutional.

### C.  **Plaintiff's Remaining Claims**

Plaintiff's remaining claims arise out of the series of events that occurred after Santiago sought to detain Plaintiff by blocking her exit. When Santiago attempted to block Plaintiff's exit, she resisted. (Santiago's Aff. (Doc. 41-1) ¶¶

14, 16-21; Pl.'s Aff. (Doc. 47) ¶ 13;[13] Defs.' Video 4 Entitled
"MAIN ENT W SIDE-2019-06-12-Kilo2 hands on" at 01:48-04:30.) A
physical confrontation ensued and culminated in Plaintiff's
arrest. (See Defs.' Video 4 Entitled "MAIN ENT W SIDE-2019-06-
12-Kilo2 hands on" at 01:48-04:30; Pl.'s Ex. 1, Administrative
Claim (Doc. 1-1) at 10, 13.) After arrest, Plaintiff was
subjected to a mental health assessment onsite at the VA clinic,
and then she was issued a citation and released. (Santiago's
Aff. (Doc. 41-1) ¶¶ 22-24, 27; see also Pl.'s Aff. (Doc. 47) ¶
36-38.)

### i.   __Fourth Amendment Bivens Claim__

Plaintiff alleges that Santiago used excessive force to
effectuate her arrest in violation of her Fourth Amendment
rights. (Compl. (Doc. 1) ¶¶ 36-42.)[14]

"In Bivens, the Supreme Court held for the first time that
there existed an implied cause of action under the Fourth

---

[13] Plaintiff does not dispute that she engaged in a physical
confrontation with Santiago in her affidavit. However, she
contends that she "was not resisting arrest, because [she] did
not know that [Santiago] intended to arrest [her]." (Pl.'s Aff.
(Doc. 47) ¶ 13.)

[14] Plaintiff also alleges in her Verified Complaint that
Defendants Santiago and Nellis facilitated an "unreasonably
lengthy detention," (Compl. (Doc. 1) ¶ 42), when they held
Plaintiff on site at the VA clinic after her arrest and
subjected her to a mental health evaluation. This court
construes Plaintiff's allegation of an "unreasonably lengthy
detention" to be part of her FTCA claim for false imprisonment,
which it analyzes below.

Amendment to sue federal officials for money damages arising from an unreasonable search and seizure." Mays v. Smith, 70 F.4th 198, 202 (4th Cir. 2023), cert. denied, 144 S. Ct. 1008 (2024) (citing Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388(1971)).

In recent years, the Supreme Court "has imposed a 'highly restrictive' analysis for future Bivens cases" and "has made clear that expanding the Bivens remedy to a new context is an 'extraordinary act,' that will be unavailable 'in most every case.'" Id. (citations omitted). At summary judgment, Defendants do not challenge that "Plaintiff's Bivens claim [is] the same sort of Fourth Amendment implied cause of action that the Supreme Court recognized in its Bivens decision," but "reserve the right to argue that the claim is an impermissible extension of that case law to a new content if this case is not dismissed on summary judgment." (Defs.' Br. (Doc. 41) at 21 n.1 (citing Hernandez v. Mesa, 589 U.S. 93 (2020)).)

Regarding excessive force, Plaintiff alleged in her Verified Complaint that Santiago "initiated [the] physical confrontation," (Compl. (Doc. 1) ¶ 13), "laid his hands upon Plaintiff, violently assaulted her, threw her to the floor, and caused Plaintiff to suffer personal injuries, humiliation, severe emotional distress, and other injuries." (Id. ¶ 22.)

- 43 -

Plaintiff also alleged that she suffered discrete physical injuries from this force such as "a mini-stroke, bruising, contusions and other bodily injuries," as well as the aggravation of other physical and mental conditions. (Id. ¶ 18.)

In his affidavit, Santiago describes the escalation of his physical confrontation with Plaintiff this way: "[Plaintiff] actively and physically resisted me detaining her. She pushed me and attempted to leave. Due to her use of force, I positioned myself between [her] and the exit while giving her verbal commands to deescalate . . . [s]he continued to use force and attempt to leave." (Santiago's Aff. (Doc. 41-1) ¶¶ 16–17.) Plaintiff "physically pushed me and tried to get past me in order to exit the clinic. I continued to stand my ground and block her exit . . . [Plaintiff] attempted to push my arm out of her way and put her body weight against me in an attempt to leave." (Id. ¶ 18.) Finally:

> As [Plaintiff] was pushing against me, she tripped over a sign that was on the floor in the corner of the vestibule. This caused her to fall backwards. As she was falling to the ground, I braced myself against a glass wall and attempted to catch her arm and prevent the fall. I was unable to catch her or prevent her fall to the floor of the vestibule.

(Id. ¶ 19.)

In her affidavit, Plaintiff offers numerous subjective conclusions about the security footage that this court does not

- 44 -

accept as fact. However, she also directly disputes two of Santiago's assertions. First, she states: "I did not trip on the sign in the vestibule," rather "Santiago pushed me from behind causing me to fall forward onto the floor." (Pl.'s Aff. (Doc. 47) ¶¶ 14, 23.) Second, she states: "[At the time that I fell], Santiago had not informed me that he intended to arrest me, or that I was not free to leave." (Id. ¶ 14; see also id. ¶ 22.)

After considering Plaintiff's and Santiago's affidavits, this court finds that there is genuine dispute over whether Santiago intentionally pushed Plaintiff to the ground or whether she tripped over the sign on her own accord. This court also finds that there is genuine dispute over whether Santiago verbally informed Plaintiff she was not free to leave before he detained and arrested her. The video footage submitted by the parties does not resolve either disputed fact. Lacking audio, the footage cannot prove whether Santiago verbally communicated to Plaintiff that she was "not free to leave." Additionally, although the footage captures the moment Plaintiff fell to the ground, reasonable viewers of the footage could find that Santiago placed his hands on Plaintiff's back and pushed (as Plaintiff contends) or that Plaintiff tripped, and Santiago merely reached out to grab her (as Santiago contends). Because the video footage does not "blatantly contradict" Plaintiff's

accounting of the facts, her accounting is credited as the
nonmovant at summary judgment. See Witt v. W. Va. State Police,
Troop 2, 633 F.3d 272, 277 (4th Cir. 2011); Hupp v. Cook, 931
F.3d 307, 315 n.3 (4th Cir. 2019).

Further, this court finds that these genuine disputes of
fact are material to Plaintiff's Fourth Amendment claim for
excessive force. Courts "evaluate whether an officer has used
excessive force based on a standard of 'objective
reasonableness.'" Wilson v. Prince George's Cnty., Md., 893 F.3d
213, 219 (4th Cir. 2018) (citation omitted). Determining
"objective reasonableness" is

> guided by the framework of Graham v. Connor, 490 U.S.
> 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). That is,
> although [courts] give "careful attention to the
> facts and circumstances of each particular case,"
> there are three factors central to the inquiry: "the
> severity of the crime at issue, whether the suspect
> pose[d] an immediate threat to the safety of the
> officers or others, and whether he [was] actively
> resisting arrest or attempting to evade arrest by
> flight." See Graham, 490 U.S. at 396, 109 S.Ct. 1865.
> And in the Fourth Circuit, [courts] consider a fourth
> factor — "the extent of the plaintiff's injuries."
> See Hupp v. Cook, 931 F.3d 307, 322 (4th Cir. 2019);
> see also Rowland v. Perry, 41 F.3d 167, 174 (4th Cir.
> 1994).

Nazario v. Gutierrez, 103 F.4th 213, 234 (4th Cir. 2024).
"Ultimately, the overarching inquiry is whether the force that
was used was proportional under the circumstances." Id.

- 46 -

Here, the "overarching inquiry" of whether Santiago's force was "proportional under the circumstances," see id., is difficult to determine without first resolving the factual dispute about what force he used to effectuate the arrest (i.e., whether he pushed Plaintiff to the ground). In addition to obscuring the "overarching inquiry," the genuine disputes of fact implicate at least two of the four enumerated factors courts in this circuit use to evaluate excessive force. See id. Regarding the fourth factor, the "extent" of Plaintiff's injuries cannot be properly weighted without resolving whether her injuries were caused by Santiago's push, or by Plaintiff's own inadvertent trip and fall. Regarding the third factor, the extent to which Plaintiff was "actively resisting arrest" cannot be properly weighted without a finding as to whether Santiago notified Plaintiff that she was being subjected to an investigatory detention or sought to block her exit without explanation. See Smith v. Ray, 781 F.3d 95, 99, 102-03, 106 (4th Cir. 2015) (finding that the third Graham factor cut in favor of the plaintiff when an officer grabbed the plaintiff "without warning or explanation" and without telling her that she "was

subject to an investigation detention or under arrest"). These disputes of material fact must be resolved at trial.[15]

Likewise, at this stage, Santiago is not entitled to qualified immunity on the issue of excessive force. "The doctrine of qualified immunity shields government officials from liability for civil damages when their conduct does not violate clearly established constitutional or other rights that a reasonable officer would have known." Hupp, 931 F.3d at 317 (citation omitted). "An official violates a clearly established constitutional right when, in the light of preexisting law, the unlawfulness of the actions is apparent." Yates v. Terry, 817 F.3d 877, 887 (4th Cir. 2016) (cleaned up) (internal quotation marks and citations omitted). In the context of an excessive force claim, "[t]he [(qualified)] immunity test and the test on the merits both rely on an objective appraisal of the

---

[15] At the motion to dismiss stage, this court reviewed the video footage and found, based on the facts alleged at the time, "that Santiago did not commit an assault, or use unreasonable force, if he lawfully detained Plaintiff at the start of the confrontation." (Mem Op. and Order (Doc. 27) at 9.) Because the parties' affidavits, submitted at summary judgment, create genuine disputes of material fact identified herein, Defendants are not entitled to judgment as a matter of law on the issue of excessive force. Relatedly, to the extent either Plaintiff or Defendant contend that finding at the motion to dismiss stage should be construed as the law of the case, it is hereby amended. The affidavits provide a different fact pattern from that before the court in the complaint and motion to dismiss stage.

reasonableness of the force employed," Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994), although "the immunity inquiry must be filtered through the lens of the officer's perceptions at the time of the incident in question." Id. "Graham v. Connor . . . frames the reasonableness determination . . . , evaluating all relevant factors rather than any one in isolation." Id.

As discussed above, disputes of fact prevent the court from assigning proper weight to two of the four enumerated Graham factors. At least one of the remaining factors appears to favor Plaintiff. Regarding the second factor, Plaintiff alleges in her Verified Complaint that Santiago is "much younger and stronger" than her, (Compl. (Doc. 1) ¶ 41), a fact that Defendants do not dispute. Moreover, Plaintiff did not possess a weapon, and no other facts in the record suggest that she presented an ongoing threat to Santiago, or others, at the time of their encounter by the clinic's entrance. See Smith, 781 F.3d at 102 (finding that the second Graham factor favored plaintiff when the officer was "a pretty good size man" while the suspect was "a smaller woman," and the officer "did not have any reason to believe that [the suspect] was armed"); see also Hupp, 931 F.3d at 322–23.

Regarding the first factor, the severity of the crimes for which Plaintiff was arrested are arguably "slight." See Hupp, 931 F.3d at 322. Plaintiff was arrested for disorderly conduct

- 49 -

and delaying, obstructing, and resisting – both misdemeanor offenses. In the context of the Graham factors, the Fourth Circuit draws contrast between these types of "nonviolent misdemeanor offense[s],"[16] and others that inherently provide the arresting officer "reason to believe that [the suspect] was a potentially dangerous individual." Smith, 781 F.3d at 102; see also Hupp, 931 F.3d at 322.

If the trier of fact finds that one, or both, of the presently indeterminable factors weigh in favor of Plaintiff, then it may be that the "weakness of the Graham factors [here] was so apparent that any reasonable officer would have realized that the force employed was excessive." See Smith, 781 F.3d at 106.

---

[16] Because Plaintiff physically resisted Santiago's detention, it is questionable whether the misdemeanor conduct for which she was arrested was "nonviolent."

In Hupp, the Fourth Circuit found that a misdemeanor "obstruction" charge was a "slight" offense that favored the plaintiff, even when the plaintiff allegedly cursed repeatedly at the officer and refused to comply with orders. See Hupp, 931 F.3d at 315, 325. Granted, in Hupp, there were not allegations that the plaintiff used physical force or pushed the officer as part of their refusal to comply, see generally id., as there are here.

However, even if the first Graham factor favors Santiago, this does not change this court's analysis as to qualified immunity. See id. at 322-23 (denying qualified immunity at summary judgment even though one of the four factors clearly favored the defendant-officer).

In a similar case, the Fourth Circuit denied qualified immunity for an officer who allegedly "grabb[ed] and thr[ew]" a suspect to the ground and "push[ed] her against the police car[,]" see Hupp, 931 F.3d at 322, even though the officer's use of force caused only "minor injuries" to the suspect – a factor that weighed clearly in favor of the officer. Id. There, the court found (1) that the severity of the suspect's crime was minor, (2) that the suspect did not pose an immediate threat to the officer or others, and (3) that there were disputed facts concerning the extent to which the suspect resisted arrest. Id. at 322–23. In other words, one factor clearly favored the defendant-officer, two factors favored the suspect, and one factor was indeterminable due to disputed facts. See id. Here, one, if not two, factors favor Plaintiff (she alleges significant injuries, and the severity of the crimes for which she was arrested are arguably "slight") and two factors are indeterminable due to disputed facts.

Depending on the resolution of disputed facts at trial, it could well be that Santiago violated the Fourth Amendment's prohibition on excessive force, and that this violation was clearly established, prohibiting the application of qualified immunity. At summary judgment, Santiago is not entitled to qualified immunity on the issue of excessive force. See Hupp,

931 F.3d at 318 (explaining that the application of qualified immunity "cannot be decided on summary judgment if disputes of the historical facts exist").

### ii. Assault and Battery

Plaintiff's Federal Tort Claims Act ("FTCA") claim for assault and battery against the United States is grounded in the same facts that underly her <u>Bivens</u> claim for excessive force against Santiago. (<u>See</u> Compl. (Doc. 1) ¶¶ 21–24; <u>see</u> <u>also</u> Doc. 23 (substituting the United States in place of Santiago as the defendant for Plaintiff's assault and battery claim).)

"Under North Carolina law, a plaintiff may maintain a civil action for assault arising from an arrest if it is accomplished by excessive force. Like a Fourth Amendment excessive-force claim, the question of whether an officer has used excessive force is judged by a standard of objective reasonableness." <u>Caraway v. City of Pineville</u>, 111 F.4th 369, 385 (4th Cir. 2024) (cleaned up) (internal quotation marks and citations omitted).

Having found that genuine disputes of material fact prevent this court from awarding summary judgment to Defendants on the issue of excessive force, it likewise finds that Plaintiff's

FTCA claim for assault and battery survives summary judgment as well.[17]

### iii. **False Imprisonment**

Under North Carolina law, the "elements of false imprisonment include: (1) the illegal restraint of plaintiff by defendant, (2) by force or implied threat of force, and (3) against the plaintiff's will." Wilkerson v. Duke Univ., 229 N.C. App. 670, 674, 748 S.E.2d 154, 158 (2013) (internal quotation marks and citations omitted). "False arrest is a form of false imprisonment." Fowler v. Valencourt, 334 N.C. 345, 348, 435 S.E.2d 530, 532 (1993).

Plaintiff alleges in her Complaint that "Santiago and Nellis arrested [her] without probable cause or excuse" and then "intentionally detained [her] against her will." (Compl. (Doc. 1) ¶¶ 26–27.) At summary judgment, she argues: "Santiago clearly prevented [Plaintiff] from going where she wanted to go, and compelled her to stay where she did not wish to stay, the definition of false imprisonment." (Pl.'s Resp. (Doc. 46) at 19.) This court construes Plaintiff's claim for false imprisonment to

---

[17] Neither party addressed at summary judgment whether the discretionary function exception deprives this court of subject matter jurisdiction concerning Plaintiff's FTCA claims. See Medina v. United States, 259 F.3d 220, 224–26 (4th Cir. 2001). As necessary, this court will address subject matter jurisdiction at trial and hear arguments from counsel.

be that she was subjected to an "illegal restraint" by way of three alleged Fourth Amendment violations: an investigatory detention absent reasonable suspicion, an arrest absent probable cause, and an unreasonably lengthy custody brought upon by the mental health assessment she was subjected to after arrest.

This court already found that Santiago's investigatory detention of Plaintiff was constitutional. (See supra Section IV.B.) It further finds that Santiago had probable cause to arrest Plaintiff after she resisted that lawful detention.

Probable cause "turns on two factors: the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct." Hupp, 931 F.3d at 318 (internal quotation marks and citations omitted). "While [courts] look to the information available to the officer on the scene at the time, [courts] apply an objective test to determine whether a reasonably prudent officer with that information would have thought that probable cause existed for the arrest." Id.

Plaintiff was charged with disorderly conduct and for "delay, obstruct, and resisting an officer." (Pl.'s Ex. 1, Administrative Claim (Doc. 1-1) at 10, 13.) The charging statute for the resisting offense provides: "If any person shall willfully and unlawfully resist, delay or obstruct a public officer in discharging or attempting to discharge an official

duty, the person is guilty of a Class 2 misdemeanor." See N.C. Gen. Stat. § 14-223(a).

There is no doubt that Santiago was "attempting to discharge an official duty" – i.e., temporarily detain Plaintiff to investigate her involvement in possible crimes at the kiosk – at the time Plaintiff resisted. Santiago asserts in his affidavit that when he positioned his body in front of Plaintiff to block her exit, she used "physical force" and "pushed" him. (Santiago's Aff. (Doc. 41-1) ¶ 18.) Moreover, the video footage confirms that, at minimum, Plaintiff repeatedly tried to step around Santiago and evade detention. "[A] reasonably prudent officer with that information would have thought that probable cause existed for the arrest." See Hupp, 931 F.3d at 318.

Plaintiff does not dispute that she physically resisted Santiago's detention, but rather argues that she was legally permitted to resist Santiago because the detention was "unlawful." (Pl.'s Resp. (Doc. 46) at 19.) Specifically, she argues: "[A] citizen may remonstrate against officers, make a display, and may resist by reasonable means [an] unlawful arrest. That is precisely what [Plaintiff] did when Santiago unlawfully detained her, and unlawfully arrested her." (Id. (citing, inter alia, John Bad Elk v. United States, 177 U.S. 529 (1900)).)

However, this court found that Santiago had reasonable suspicion necessary to lawfully detain Plaintiff. Thus, her argument that she merely resisted an unlawful detention fails.[18]

Plaintiff's third and final argument that she was subjected to an "illegal restraint" is based on her allegation that Santiago and Nellis subjected her to an "unreasonably lengthy detention" when they "detained [Plaintiff] at the Kernersville VA Clinic for hours" following her arrest. (Compl. (Doc. 1) ¶ 42.) It is undisputed that, after arresting Plaintiff, Santiago "escorted" her "to the mental health reception area" of the VA clinic and called in "Dr. Herman Diggs, a VA psychologist," to

---

[18] Plaintiff also submitted as an exhibit an unpublished case from the North Carolina Court of Appeals, State v. York, 233 N.C. App. 240, 758 S.E.2d 706, 2014 WL 1384422 (2014). (See Doc. 46-1). In her brief, Plaintiff did not expound on this case's relevance to her argument. State v. York provides the rule that an officer may arrest a suspect on misdemeanor charges only if the officer personally witnessed the offense, or if certain exigent circumstances are present. Id. at *3. However, Plaintiff's reliance on State v. York is inapposite to the facts of her case. Here, Santiago attempted to detain Plaintiff in order to investigate her possible misdemeanor offenses at the kiosk – offenses that he did not personally witness. When Plaintiff resisted that detention, Santiago arrested her for disorderly conduct and delay, obstruct, and resist – offenses she committed in his immediate presence. Thus, his actions comport with the State v. York rule.

perform a mental health evaluation. (Santiago's Aff. (Doc. 41-1)
¶¶ 22-24.)[19]

It is also undisputed that sometime during Plaintiff's
custody, Santiago's supervisor, Lieutenant Travis Nellis, "was
called in to assist and advise." (Santiago's Aff. (Doc. 41-1) ¶
25.) After consulting with Nellis, Santiago "determined that it
would be in Ms. Street's best interest to be arrested by
citation, rather than be physically arrested." (Id.) Santiago
"provided [Plaintiff] with her citations" and then released
Plaintiff "and she left of her own accord." (Id. ¶ 27; see also
Pl.'s Aff. (Doc. 47) ¶¶ 36, 38.) Plaintiff does not dispute

---

[19] Plaintiff asserts that she heard Dr. Diggs inform
Santiago at one point that "she is of sound mind," (Pl.'s Aff.
(Doc. 47) ¶ 32), but has not marshalled facts to dispute
Santiago's assertion that Dr. Diggs also informed him, after his
assessment of Plaintiff, that she suffered from trauma, did not
trust police, and "did not do well with men which likely caused
the belligerent behavior." (Santiago's Aff. (Doc. 41-1) ¶¶ 22-
24.)

these facts but contends that the whole ordeal from arrest to release took "many hours." (Pl.'s Aff. (Doc. 47) ¶ 35.)[20]

At summary judgment, Plaintiff's legal argument appears to be that her Fourth Amendment rights were violated, and her detention was "unreasonably" extended, because Santiago decided to subject Plaintiff to a post-arrest mental health assessment. (See Pl.'s Resp. (Doc. 46) at 18, 19–20; see also Compl. (Doc. 1) ¶ 42.) To support her argument, Plaintiff cites only one case, Caniglia v. Strom, 593 U.S. 194 (2021), which holds that officers' "community caretaking functions" do not provide a blanket exception to the warrant requirement for searches and seizures in the home, see id. at 196, an area of Fourth Amendment law not implicated in the current action.

---

[20] Plaintiff alleges other facts in her affidavit about her time in custody, such as that Santiago had a "plan" to "lock[]" Plaintiff in a "psych ward in Salisbury," but that Dr. Diggs "refused to go along" with it. (Id. ¶ 29.) This "plan" did not come to fruition, and this allegation by Plaintiff does not create a genuine issue for trial. Reviewing both parties' affidavits, it appears that Plaintiff only genuinely contradicts one of Santiago's assertions about Plaintiff's time in custody: Santiago asserts that at one point he "removed [Plaintiff's] handcuffs to help ensure she remained calm and to allow for a better assessment of her mental health." (Santiago's Aff. (Doc. 41-1) ¶ 23.) Plaintiff asserts that Santiago did not voluntarily remove her handcuffs, but rather he did so "only reluctantly" after a VA physician arrived on the scene and "insisted" that he remove them. (Pl.'s Aff. (Doc. 47) ¶ 30.) Regardless, this dispute of fact is not material to Plaintiff's claim that her custody was "unreasonably lengthy."

- 58 -

The Fourth Circuit instructs that "officers may seize a person for an emergency mental health evaluation, so long as they have probable cause. Such probable cause exists when officers know reliable facts sufficient to warrant a prudent man to believe that the person poses a danger to [herself] or others." Putman v. Harris, 66 F.4th 181, 185–86 (4th Cir. 2023) (internal quotation marks and citations omitted). The Fourth Circuit notes that officers may reasonably rely "on their perceptions" that a suspect poses a danger to themselves or others, especially when that officer has "ample opportunity to observe and interview" the suspect. See Raub v. Campbell, 785 F.3d 876, 883–84 (4th Cir. 2015) (awarding qualified immunity to an officer and stating, in dicta, it was "doubtful" that the officer violated plaintiff's Fourth Amendment rights).

Notably, here, Santiago already possessed probable cause to arrest Plaintiff on criminal charges. Thus, it is not clear that he needed to independently establish probable cause that her mental state "pose[d] a danger to [herself] or others," see Putman, 66 F.4th at 186, in order to subject her to an onsite mental health evaluation as part of the post-arrest booking process. For her part, Plaintiff argues only that Santiago's "'concerns' about [her] mental health [were] unreasonable." (Pl.'s Resp. (Doc. 46) at 10.) She cites no caselaw to establish

what standard governs the reasonableness of post-arrest mental health evaluations, and instead, only repeats the general proposition that an officer's conduct under the Fourth Amendment is typically judged "upon an objective standard." (Id. at 18 (citing Kingsley v. Hendrickson, 576 U.S. 389 (2015); Short v. Hartman, 87 F.4th 593 (4th Cir. 2023)).)

In his affidavit, Santiago explains that, after arresting Plaintiff, he "had concerns regarding her mental health" due to her "belligerence and aggressive behavior." (Santiago's Aff. (Doc. 41-1) ¶ 22.) Because of those concerns, Santiago "escorted" Plaintiff "to the mental health reception area for an assessment." (Id.)

Plaintiff argues that Santiago's concerns were "unreasonable" because Santiago "knew or should have known" that Plaintiff had just visited with a mental health professional, Dr. Stanley, prior to her arrest. (Pl.'s Resp. (Doc. 46) at 10, 17.) However, this argument is unavailing because Santiago's concerns regarding Plaintiff's mental health arose from his perceptions of her "belligerence and aggressive behavior" during his physical struggle with her near the clinic's entrance, which occurred after Plaintiff's appointment with Dr. Stanley and thus involved conduct about which Dr. Stanley would have had no knowledge at the time of the appointment.

Plaintiff also argues, without citing caselaw, that "Santiago failed to demonstrate that he had any training or qualifications of any kind to make any sort of assessment of [Plaintiff's] mental condition." (Id. at 10.) But this argument runs counter to the Fourth Circuit's clear charge that law enforcement officers may "seize a person for an emergency mental health evaluation." Putman, 66 F.4th at 185.

Finally, Plaintiff asserts that her booking process took "many hours," (Pl.'s Aff. (Doc. 47) ¶ 35), but has offered no argument or facts which show that a booking process of "many hours," ending with a citation and an onsite release from her place of arrest, is any lengthier than what an arrestee typically experiences when they are subjected to a formal booking process at a magistrate office or jail.

On the record before this court, "there is an absence of evidence to support" Plaintiff's claim that she was subjected to an unreasonably lengthy detention on account of her post-arrest mental health evaluation, Celotex Corp., 477 U.S. at 325, and Plaintiff has not identified specific facts "showing that there is a genuine issue for trial" related to this claim, see McLean, 332 F.3d at 718-19.

Having found that Santiago did not violate Plaintiff's Fourth Amendment rights when he initially detained Plaintiff, when he arrested Plaintiff, or when he subjected her to a mental health assessment with a VA psychologist after her arrest, Plaintiff's claim for false imprisonment fails as a matter of law.

## V. <u>CONCLUSION</u>

Defendant Santiago lawfully detained Plaintiff roughly two minutes into their encounter near the VA clinic's entrance based upon reasonable suspicion that Plaintiff had been involved in criminal activity during her incident with Mr. Cummings at the kiosk in the VA clinic's lobby. After Plaintiff resisted detention, Santiago formed probable cause to arrest Plaintiff. There is an absence of evidence to support Plaintiff's claim that she was subjected to an unreasonably lengthy custody post-arrest. However, there are genuine disputes of material fact regarding the force Santiago used to effectuate Plaintiff's arrest, and whether that force was reasonable under the circumstances. As such, Plaintiff's claim for excessive force against Defendant Santiago, and her claim for assault and battery against the United States, survive summary judgment.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment, (Doc. 40), is **GRANTED IN PART AND DENIED IN PART.** It is **GRANTED** as to Claim II, false imprisonment against the United States. It is **DENIED** as to Claim I, assault and battery against the United States. It is further **DENIED** as to Claim IV, <u>Bivens</u> excessive force claim against John Santiago.

This the 14th day of February, 2025.

_____
William L. Osteen, Jr.
United States District Judge